# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARL HENDERSON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MERCY CATHOLIC | : | |
| MEDICAL CENTER, | : | No. 17-1271 |
| Defendant. | : | |

## MEMORANDUM

**Schiller, J.**                                                     **July 9, 2018**

Carl Henderson worked for Mercy Catholic Medical Center ("Mercy") as an emergency medical technician. He was slated to work on August 15, 2015 at the Lansdowne Fire Company, but due to a community event he wanted to attend, he sought to swap shifts with a colleague. He believed that he swapped shifts with Kim Ewing, and therefore attended the community event. However, Ewing was unable to take Henderson's shift. A dispute over the shift swap ensued, with Henderson accused of failing to show up for work. After the investigation and fallout of the August 15, 2015 night shift at the fire station, Henderson's supervisor received communications indicating that Henderson was resigning from his job. Henderson denies resigning. Henderson's supervisor sought a meeting with him to discuss the shift swap. That meeting never occurred.

According to Henderson, he was fired because of his race. Henderson brings claims for discrimination and retaliation under 42 U.S.C. § 1981, Title VII, and the Pennsylvania Human Relations Act ("PHRA"). Mercy has filed a motion for summary judgment, which is presently before the Court. For the reasons that follow, the motion is granted and Henderson's claims are dismissed.

# I.  FACTUAL BACKGROUND

Henderson, who is African-American, began working for Mercy on June 18, 2012, as a security officer at Mercy Fitzgerald Hospital ("Mercy Fitzgerald"). (Def.'s Statement of Undisputed Material Facts ¶ 1.) On November 25, 2012, Lawrence Smythe, Mercy's director of pre-hospital services and chief of emergency medical services, hired Henderson to be a pool emergency medical technician for Mercy Fitzgerald. (*Id*. ¶ 2.) Henderson's supervisor in that role was Chief Smythe. (*Id*. ¶ 3.) Henderson became a full-time emergency medical technician on January 20, 2013. (*Id*. ¶ 5.) Chief Smythe reported that Henderson "meets standards" during performance reviews in 2013, 2014, and 2015. (*Id*. ¶ 18.) Henderson was never disciplined while he worked at Mercy Fitzgerald. (*Id*.)

The job duties of an emergency medical technician included responding to emergencies, providing life support to patients and victims, and assisting paramedics. (*Id*. ¶ 6.) Mercy provided emergency medical services to the Lansdowne Fire Company. (*Id*. ¶ 8.) Because the fire company operated twenty-four hours a day, seven days a week, Mercy was contractually required to always have two emergency medical technicians on duty working out of the Lansdowne firehouse. (*Id*. ¶ 9.)

According to Mercy's policy for shift swapping, Chief Smythe or Timothy Quinn, the assistant chief, had to approve shift swaps. (*Id*. ¶ 20.) To swap shifts, an emergency medical technician had to submit a mutual exchange form to Chief Smythe, Quinn, or Kathy Davis, Mercy's assistant to the director of emergency medical services. (*Id*. ¶¶ 21–22.) Unapproved swaps would be considered unscheduled absences and could result in discipline, including termination. (*Id*. ¶ 20.) Chief Smythe testified that he did not discipline any employee between 2015 and 2017 for not following the policy and Henderson testified that he was not aware of whether any of his co-workers were ever disciplined for failing to follow the policy. (*Id*. ¶ 26.)

## A. The August 15, 2015 Shift and Its Aftermath

Henderson normally worked twelve-hour shifts and was assigned to work at the Lansdowne firehouse. (*Id*. ¶ 11.) Early in the week of August 15, 2015, Henderson remembered that he was supposed to attend a cook-out on August 15. (*Id*. ¶ 33.) He was scheduled to begin a twelve-hour shift on August 15 at 7:00 p.m. (*Id*. ¶ 36.) On the morning of August 15, Henderson asked Kimberly Ewing, another emergency medical technician, whether she could cover his shift so that he could attend the event. (*Id*. ¶ 38.) According to Henderson, Ewing agreed to cover his shift, and Henderson prepared the proper paperwork.[1] (*Id*. ¶ 39.) Henderson received approval for the swap, provided Ewing agreed to it and Henderson submitted the proper paperwork. (*Id*. ¶ 40.) Chief Smythe never received the completed paperwork indicating that Ewing agreed to the shift swap. (*Id*. ¶ 41.)

At 12:38 p.m. on August 15, 2015, Ewing sent to Henderson a text stating that she had spoken to her children's father and it was "[n]o go for tonight. Sorry. No one to be with girls." (*Id*. ¶ 47.) When Henderson failed to respond to Ewing's text, she sent him another one at 3:25 p.m., which inquired whether he had seen the 12:38 p.m. text. (*Id*. ¶ 48.) Henderson testified that he believed that he had received and read text messages from Ewing on that day, but he could not recall the content of the texts. (*Id*. ¶ 50.) Henderson recalled that before the start of his 7:00 p.m. shift, he became aware that Ewing was unable to cover the shift. (*Id*. ¶ 51.)

Ewing thought that Henderson would report for the 7:00 p.m. shift on August 15, 2015, but Henderson did not show up for work. (*Id*. ¶¶ 52–53.) At 7:23 p.m., Ewing called Chief Smythe to

---

[1] This fact is contested. According to Ewing—and the evidence submitted in the record— she agreed to swap shifts with Henderson only if the swap was approved and Ewing was able to find somebody to watch her children. Because Ewing was unable to find somebody to watch her kids, she testified that she did not swap shifts with Henderson. For purposes of this motion, the Court will credit Henderson's testimony that he and Ewing agreed to swap shifts.

advise him that Henderson did not show up for work and to explain the shift swap situation. (*Id*. ¶¶ 54–55.) Three minutes later, Chief Smythe spoke with Henderson in an attempt to rectify the situation; Chief Smythe told Henderson that Henderson would have to cover the shift if Henderson could not find somebody to do it. (*Id*. ¶¶ 56–59.) Henderson told Chief Smythe that he was at an event and that he would call back in ten minutes. (*Id*. ¶ 61.) Henderson proceeded to contact co-workers in an attempt to find somebody to cover his shift, but to no avail. (*Id*. ¶ 63.) Henderson subsequently called Chief Smythe and told him that he had not found anybody to take his shift and that he was not coming in to work the shift. (*Id*. ¶ 66.) Chief Smythe and Quinn attempted to contact Henderson several times between 9:30 p.m. and 10:00 p.m. about Henderson working on August 15, but Henderson never responded.[2] (*Id*. ¶ 69.) Henderson failed to work his shift on August 15, 2015. (*Id*. ¶ 70.)

On August 17, 2015, Henderson met with Chief Smythe and Quinn to discuss the events of August 15, 2015. (*Id*. ¶ 75.) According to Henderson, Chief Smythe became very upset with him and Henderson "felt threatened" during this meeting, particularly because Chief Smythe refused his request to leave the meeting. (Def.'s Mot. for Summ. J. Ex. A [Henderson Dep.] at 170.) Chief Smythe "became more irate and bang[ed] his fist on the table as he was talking to me." (*Id*.) Henderson was not formally disciplined for failing to report to work on August 15, 2015. (Def.'s Statement of Undisputed Facts ¶ 89.) At the end of this meeting, Chief Smythe informed Henderson that Chief Smythe would be discussing the incident with John Cigler, the human resources director

---

[2] At Henderson's deposition, he was unable to recall the time when he tried to contact others to take his shift. (Henderson Dep. at 122.) He also could not recall exactly when he spoke to Chief Smythe. (*Id*. at 122–23, 134–35.) This disagreement over timing is not material to the Court's analysis.

at Mercy. (*Id*. ¶ 91.) Chief Smythe contacted Cigler, who requested a meeting with himself, Henderson, and Chief Smythe; the meeting did not occur because Henderson did not provide his availability for such a meeting. (*Id*. ¶¶ 92–93.)

On August 21, 2015, Henderson met with Cigler to file a complaint against Chief Smythe and to discuss the events of August 15, 2015. (*Id*. ¶ 110, 112.) Cigler advised Henderson that he would conduct an investigation into Henderson's concerns about Chief Smythe. (*Id*. ¶ 119.) Cigler spoke with Chief Smythe and Ewing, but he did not meet with Henderson and Chief Smythe together because Henderson did not respond to attempts to schedule a meeting. (*Id*. ¶¶ 121–26.)

**B.  The Resignation and Its Aftermath**

On August 24, 2015 at 3:36 p.m., Chief Smythe and Quinn received an email from the email address newmedic19@gmail.com. The email stated:

> Good afternoon guys. After all this caos that has been going on I have decide to go else where and work. I don't belong at Mercy Hospital anymore. I have passed my test and now Im A medic now. Im so glad and it feels great. Off to better things nad better people. I will not be in tomorrow. Thanks for the good times and all the rest of the headaches as well. I Have filled a lawsuit and contacted the NAACP as well. But yaw have a great life and enjoy KIM and her madness.

> Carl Henderson JR NRP

(Def.'s Mot. for Summ. J. Ex. X [Resignation email].)[3] About thirty minutes later, Chief Smythe received another email from newmedic19@gmail.com. This email stated:

> I will drop off my uniforms Friday afternoon. I will not be using my old email 1hiram2012@gmail anymore. All important things have been rerouted. Its time for a change. If any questions email me or call my phone.

(*Id*. Ex. Y [Aug. 24, 2015 Uniforms email] .) Although the email displayed the name "Alan Johnson"

---

[3] Emails in this Memorandum are presented as they were written, including spelling and grammar errors.

along with the email address, Chief Smythe testified that he believed these emails came from Henderson. (Def.'s Statement of Undisputed Material Facts ¶ 129.) In particular, the emails were signed by Henderson, included personal details, and referenced his previous email address. (*Id.*) Upon receipt of these emails, Chief Smythe attempted to contact Henderson to set up a meeting to confirm the emails came from him, but Henderson did not respond to the request. (*Id.* ¶ 130.) Chief Smythe forwarded the emails to Cigler, who also assumed that Henderson sent the emails. (*Id.* ¶ 131.) On August 26, 2015, a paramedic at Mercy forwarded an email he had received from newmedic19@gmail.com on August 24:

> Hey Wayne its Carl. I just wanted to say it was great working with yaw and a had a lot of fun. I sent Larry, Tim and Kathy a email as well. I will not be coming back to Mercy at all. Its time to move on to better things. Larry Has not responded yet so hopefully they have coverage for tomorrow. All is well see you around

(Def.'s Mot. for Summ. J. Ex. AA [Email to Donald Alexander].)

Henderson spoke with Chief Smythe on August 25, 2015; during this conversation, Henderson denied that he sent the emails and requested that he be placed back on the schedule. (Def.'s Statement of Undisputed Material Facts ¶ 136.) Chief Smythe informed Henderson that he would look into the matter, and that Henderson would need to meet with human resources before he could be placed back on the schedule. (*Id.* ¶ 137.) Chief Smythe and Cigler both asked Henderson for his availability for a meeting, but Henderson did not respond with his availability. (*Id.* ¶¶ 137–39.)

Chief Smythe sent an email to 1hiram2012@gmail.com on the morning of August 26, 2015. (*Id.* ¶ 141.) Henderson responded:

> My email is working I just checked it now. Very busy working on something out of state right now. When I free up I will give you a call.

(Def.'s Mot. for Summ. J. Ex. BB [Aug. 26, 2015 Email to Smythe].) Henderson did not call Chief

Smythe. (Def.'s Statement of Undisputed Material Facts ¶ 143.) On September 1, 2015, Henderson

emailed Chief Smythe:

> So since I have not resigned and was taken off the schedule can I be put back on the
> schedule as of Tuesday night next week. I looked into the situation more and found
> nothing. This has been a prank that someone pulled. Nothing was verified with me
> never received the copy of the email that you received. Thank You in advance have
> a great day.

(Def.'s Mot. for Summ. J. Ex. CC [Sept. 1, 2015 Email to Smythe].) On September 2, 2015,

Henderson sent Chief Smythe a text message: "Good morning since I did not quit and was not

terminated can I get back out on the schedule as of Tuesday." (Def.'s Mot. for Summ. J. Ex. DD

[Text message to Smythe].) Chief Smythe responded that a meeting with human resources was

required, and he asked Henderson for his availability for such a meeting. (*Id.* ¶ 146.) Henderson did

not respond. (*Id.* ¶ 147.)

> On September 14, 2015, Chief Smythe sent Henderson a certified letter:

> On several occasions in the last four week John Cigler, HR Director, and myself,
> have sent you text messages, emails and left phone messages for you to contact either
> of us for a meeting. As of September 14, 2015, you have not contacted us to arrange
> a meeting. Please contact one of us to arrange a meeting.

(*Id.* ¶ 148.) Henderson never responded to this letter. (*Id.* ¶ 149.)

> Ultimately, Mercy accepted Henderson's resignation, effective August 24, 2015. (*Id.* ¶ 150.)

### C. Racially-Charged Comments

Henderson testified that on a number of occasions, Chief Smythe made disturbing racially

derogatory remarks to Henderson. According to Henderson, Chief Smythe once told him that he was

worthless because he was black. (Henderson Dep. at 216–17.) Henderson could not recall when

Chief Smythe made this remark or who was present when this remark was made. (*Id*.) Henderson also testified that he was present when Chief Smythe told a former employee "to take their black ass back to the ghetto." (*Id*. at 219–20.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

### A. Racial Discrimination

Plaintiff asserts discrimination claims under Title VII, § 1981, and the PHRA. The same legal standard applies to race discrimination claims under these three statutes. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267–68 (3d Cir. 2010); *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006). Therefore, the Court will analyze Plaintiff's discrimination claims together.

Henderson contends that he was fired because of his race. This claim is governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Anderson*, 621 F.3d at 270-71 ("In the absence of direct evidence, we consider a plaintiff's claim under *McDonnell Douglas*."). A plaintiff must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the position he sought to retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If the plaintiff can make out a prima facie case, the burden of production then shifts to the employer to offer evidence of a legitimate, nondiscriminatory reason for the adverse action. *Anderson*, 621 F.3d at 271. If the employer satisfies its burden, the burden of production shifts back to the plaintiff, who must show that the employer's reason was pretextual. *Id.*

For purposes of its motion, Mercy concedes that Henderson has established the first and second elements of his prima facie case. (Def.'s Mem. of Law in Supp. of Its Mot. for Summ. J. [Def.'s Mem.] at 5.) Mercy argues that Henderson cannot establish the third or fourth elements of his prima facie case. (*Id.*) The Court agrees that Henderson has failed to establish that he suffered

an adverse employment action.

An adverse employment action includes "all tangible employment actions such as hiring, firing, failing to promote, reassignment or a decision causing significant change in benefits." *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 690 (E.D. Pa. 2016). Generally, an employee's voluntary resignation is not an adverse employment action. *Id.* at 705; *see also Schofield v. Metro. Life Ins. Co.*, Civ. A. No. 03-357, 2006 WL 2660704, at *8 (M.D. Pa. Sept. 15, 2006) ("An employee who voluntarily resigns cannot show that he or she has suffered an adverse employment decision at the hands of the employer.")

Henderson contends that he did not resign; he argues that somebody must have been playing a prank on him. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 9–12; Def.'s Mot. for Summ. J. Ex. CC [Sept. 1, 2015 email from Henderson to Smythe] ("I looked into the situation more and found nothing. This has been a prank that someone pulled.").) He has no evidence to support his prank theory. Moreover, it is the employer's perception of events that matters. *See Schofield*, 2006 WL 2660704, at *8 (concluding that it was reasonable for an employer to decide that employee had resigned after employee left a meeting and placed his security pass on the table and went home).

Here, Chief Smythe was faced with a formal, unequivocal statement that Henderson was leaving his job, and he was not coming back. Chief Smythe received an email with the subject "Resignation," that was signed by Henderson. The email states that with the chaos at work, he decided to go elsewhere and did not belong at Mercy Hospital anymore. The email states, "[t]hanks for the good times and all the rest of the headaches as well." (Resignation email.) Shortly after that first email, Chief Smythe received a second email from the same address stating that Henderson would drop off his uniforms and that he was not using his old email address. (*Id.* Ex. Y [Uniforms

email].) He noted that it was time for a change and that if Chief Smythe had any questions he could call or email Henderson. (*Id.*) On August 26, 2015, a paramedic working for Mercy forwarded to Chief Smythe an email that originated from the same email address from which Chief Smythe had received the two prior emails. The email to the paramedic stated that it was Henderson and that he was not returning to Mercy and that it was "time to move on to better things." (Email to Donald Alexander.)

Chief Smythe had received an email that he reasonably believed originated from Henderson that affirmed that Henderson quit his job. Henderson informed his supervisor that he was done working at Mercy and also said goodbye to a colleague. Additionally, Henderson demonstrated his intention to abandon his job by refusing to comply with requests to meet with Chief Smythe and Cigler. Henderson originally informed Chief Smythe that he was "[v]ery busy working on something out of state right now. When I free up I will give you a call." (Aug. 26, 2015 Email to Smythe.) Henderson did not respond to multiple follow up communications from Chief Smythe. Thus, Henderson acted in a manner consistent with somebody who had resigned his position.

Henderson and Chief Smythe spoke on August 25, 2015. Chief Smythe told Henderson that based on the emails, he removed Henderson from the schedule. Henderson informed Chief Smythe that he did not send the resignation emails and that he wanted to be placed back on the schedule. At that point, Chief Smythe reasonably informed Henderson that he needed to investigate the situation and Henderson needed to meet with human resources before he could be returned to the schedule. Defendant's actions—entirely reasonable given the circumstances—do not rise to the level of an adverse employment action in this case.

This drama surrounding Henderson's purported resignation is unbecoming of an organization

with such an important mission. The facts surrounding the events of August 2015, reads more like a group of high school students sniping at each other rather than a group of medical professionals who must be trained and ready to handle emergencies. Ultimately, what matters is that Mercy reasonably believed that Henderson voluntarily resigned from his job, and that Henderson's defense, which is essentially "wasn't me," is conjecture and insufficient to meet his burden to come forward with evidence. Mercy had multiple emails that clearly demonstrated Henderson's intent to leave his job and to not return. When Chief Smythe tried to uncover what exactly had occurred, Henderson was non-responsive to attempts to aid in that investigation. Henderson's refusal to cooperate is further evidence that he abandoned his job. But even if Henderson did not author the resignation email, Chief Smythe's follow-up and acceptance of Henderson's supposed resignation would have been based on incorrect information—it would not make that decision one based on race. Henderson has simply not come forward with evidence, as opposed to his say-so, to counter Defendant's motion for summary judgment.

To the extent Henderson's actions can be construed as an attempt to rescind his resignation by requesting that he be returned to the schedule, Mercy was under no obligation to place Henderson back on the schedule upon his request. "[A]n employer's refusal to allow an employee to rescind his resignation has been held not to be an adverse employment action." *Jones v. McCormick & Schmick's Seafood Restaurants, Inc.*, Civ. A. No. 12-4503, 2014 WL 1669808, at *5 (D.N.J. Apr. 28, 2014); *see also Hibbard v. Penn-Trafford Sch. Dist.*, Civ. A. No. 13-622, 2014 WL 640253, at *10 (W.D. Pa. Feb. 19, 2014) (collecting cases that support the proposition that failing to accept rescission of a voluntary resignation is not an adverse employment action).

Chief Smythe's subsequent communications with Henderson after the August 15, 2015 shift

fiasco make no mention of Henderson being terminated or suffering an adverse employment action resulting from his failure to show up for his shift. Indeed, the evidence is that Chief Smythe contemplated returning Henderson to the schedule, but Henderson had to discuss the matter with human resources first. Despite repeated requests, Henderson never made himself available to meet this reasonable precondition to getting back on the schedule. *See Weisel v. Stericycle Commc'ns Solutions*, Civ. A. No. 13-3003, 2015 WL 390954, at *13–14 (M.D. Pa. Jan. 28, 2015) (finding no adverse employment action when employer sought information from employee before employee could be allowed to return to work). Henderson's failure to comply with Defendant's request to meet reinforced Defendant's belief that he had resigned. It also signaled that he was abandoning his position.

Henderson resigned from his job, as evidenced by the texts and emails received by Chief Smythe and Cigler. This conclusion is bolstered by the evidence that Henderson abandoned his job by refusing to cooperate with requests to meet with human resources. Henderson did not suffer an adverse employment action and he therefore cannot make out a prima facie case for discrimination.

### B.     Pretext

The Court concludes that Henderson did not suffer an adverse employment action. However, the Court acknowledges some points in Henderson's favor on the issue. Henderson has consistently maintained that he did not send any resignation letter. Moreover, the resignation email came from an address not immediately recognizable as belonging to Henderson. Finally, he also sought to be returned to the schedule after he had purportedly resigned. Therefore, the Court will briefly address the issue of pretext.

 Even if the Court accepted that genuine issues of material fact existed on the adverse

employment action issue and as to whether the adverse action occurred under circumstances that could give rise to an inference of intentional discrimination, Mercy is still entitled to summary judgment. Henderson has failed to demonstrate pretext.

Once the employer has proffered a legitimate reason for the adverse employment decision—not in doubt here— the plaintiff must point to evidence that either: (1) casts doubt on the employer's "articulated legitimate reasons" or (2) demonstrates that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). If the plaintiff attacks the employer's credibility regarding its proffered reason for the adverse employment action, the plaintiff's evidence must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id*. Courts should not, however, inquire into whether the employer's decision was "wise, shrewd, prudent, or competent." *Id*.

Henderson cannot meet his burden. He argues that he was not repeatedly contacted to discuss the status of his resignation. Rather, he claims that he attempted to contact Mercy and that his alleged resignation followed by the abandonment of his employment was "clearly a pretext for Defendant's unlawful discriminatory termination of Plaintiff." (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 21.)

This is verbiage masquerading as legal argument. The evidence is clear that Chief Smythe attempted to arrange a meeting with Henderson to discuss matters. Indeed, Henderson even responded to one of these attempts when he informed Chief Smythe that he was very busy working on a matter out of state and that he would call Chief Smythe at a later date. He never did. Henderson has come forward with no evidence that Mercy concocted his resignation. There is no dispute that

Chief Smythe received communications that appeared to have come from Henderson and that indicated a clear intent to resign. Henderson has failed to point to any implausibilities or inconsistencies in Mercy's proffered legitimate reasons for its actions.

Finally, even if Chief Smythe made a comment about Henderson's race, Henderson has no evidence tying this remark to the end of Henderson's employment with Mercy.

### C.     Retaliation

Henderson claims that Mercy retaliated against him for reporting racial discrimination. To establish a prima facie case of retaliation, a plaintiff must provide evidence that: (1) he engaged in a protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006). An individual engages in a protected activity either by opposing unlawful discrimination or by participating in Title VII proceedings. *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 266–67 (3d Cir. 2006). Protected activity includes informal protests and complaints to management about discriminatory employment practices, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal discrimination charges. *Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130, 135 (3d Cir. 2006). However, a general complaint about unfair treatment is not protected activity. *Id*. With respect to the second prong of a prima facie retaliation claim, an adverse employment action refers to an action that might have dissuaded a reasonable worker from making or supporting a discrimination charge. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

As discussed above, Henderson cannot make out a retaliation claim because his employer

did not take an adverse employment action against him. Additionally, he cannot make out a case for retaliation because he did not engage in protected activity.

Henderson never protested discriminatory practices, either formally or informally. During his deposition, he could not recall during his meeting with Cigler ever complaining about racially discriminatory behavior. (Henderson Dep. at 215.) Rather, Henderson went to Cigler to complain about Chief Smythe and to talk about the situation with the shift change. (*Id*. at 211–12.) There is no evidence that Henderson ever reported his concerns about racial discrimination during this meeting, or that he discussed his concerns with management, a supervisor, or a compliance officer. (*Id*. at 262.) Henderson testified that he never even informed anyone about racially-charged remarks made to him. (*Id*. at 267.) Henderson said that he felt threatened because Chief Smythe acted in a hostile manner towards him and banged on the table during their meeting. (*Id*. at 211.) He made no reference to protesting racial discrimination or complaining about inappropriate racial comments. Cigler, consistent with Henderson's recollection, testified that Henderson did not complain about discrimination to anybody in the human resources department. (Def.'s Mot. for Summ. J. Ex. H [Cigler Dep.] at 36, 41.) Rather, during the meeting, Henderson voiced his concern that Chief Smythe "was very angry, had his fists clenched and was pointing towards [Henderson]." (*Id*. at 36, 46.) Thus, the record is devoid of any protected activity Henderson undertook that could serve as the basis for a retaliation claim.[4] Henderson denied Defendant's contention that he never complained

---

[4] The record remains devoid of any evidence notwithstanding Henderson's self-serving declaration, submitted along with his opposition to Defendant's summary judgment motion. Suddenly, Henderson remembered that he told Chief Smythe, Quinn, and Cigler that he was being treated differently because of his race and because he had attended a fund raiser "in the Black community." (Pl.'s Opp'n to Def.'s Mot. for Summ. J. Ex. A [Henderson Decl.] ¶¶ 14, 19.) Because there is no independent evidence in the record to support Henderson's declaration, the declaration cannot raise a genuine issue of fact. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d

to anyone at Mercy about racial remarks made while he was employed there. But he cannot pinpoint a time or an occasion when he complained about racial discrimination. And he certainly cannot get to a jury because he could not recall whether or not he complained about racially-charged statements.

If anything, Henderson voiced a general complaint about the temperament of his supervisor. This general complaint is not a protected activity. *See Curay-Cramer*, 450 F.3d at 135. For a complaint to constitute protected activity, it must be based on a protected category, such as race or age. *See Daniels v. City of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015). Moreover, to qualify as a protected activity, a complaint must be sufficiently specific to inform management of the particular type of discrimination at issue. *See Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010). Henderson cannot satisfy these requirements, and his retaliation claims are therefore dismissed.

IV.     **CONCLUSION**

Mercy is entitled to summary judgment because Henderson has not suffered an adverse employment action and cannot demonstrate pretext. Henderson also has failed to raise a genuine issue of material fact on his retaliation claims. An Order consistent with this Memorandum will be docketed separately.

---

247, 253–54 (3d Cir. 2007).